# JUDGE CHIN

HARRIS POGUST, HP8108
hpogust@pbmattorneys.com
DEREK BRASLOW
dbraslow@pbmattorneys.com
POGUST, BRASLOW & MILLROOD, LLC
Eight Tower Bridge
161 Washington Street, Suite 1520
Conshohocken, Pennsylvania 19428
Telephone:    (610) 941-4204
Facsimile:    (610) 941-4245

SHAWN KHORRAMI, SBN 180411
skhorrami@kpalawyers.com
ROBERT J. DREXLER, JR., SBN 119119
rdrexler@kpalawyer.com
MATT BAILEY, SBN 218685
mbailey@kpalawyers.com
KHORRAMI POLLARD & ABIR LLP
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
Telephone:    (213) 596-6000
Facsimile:    (213) 596-6010

*Attorneys for Plaintiff*
Jim Knight



**10 CIV 1730**

RECEIVED
MAR 04 2010
U.S.D.C.
CASHIERS

| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK | Case No.: 10 CIV 1730 (DS) |
| --- | --- |
| JIM KNIGHT, an individual, on behalf of himself and all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIACOM COMMUNICATIONS CORP., a New York Corporation,<br><br>Defendant. | **CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jim Knight (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges as follows:

002/002
p. 002
PETER FELDMAN PROCESS
MAR-04-2010(THU) 17:15
03/04/2010 17:12 FAX
Rx Date/Time

## INTRODUCTION

1.  This class action is brought on behalf of all persons who purchased Premium Cable Services, as defined herein, from Defendant Mediacom Communications Corporation (hereinafter "Mediacom" or "Defendant") and who were compelled to rent a cable box distributed by Defendant. Without a cable box, consumers cannot view or access all of the Premium Cable Services to which they subscribe. Consequently, for Premium Cable Services, Mediacom's premium cable customers have no choice to but pay a rental fee for a cable box in order to view the cable television for which they pay a separate monthly fee.

2.  Mediacom dominates the market for Premium Cable in the areas in which it operates and abuses its power by requiring consumers, as a condition of purchasing Premium Cable Services, to use and rent the cable boxes. Defendant's actions constitute an unlawful tying arrangement resulting in an impermissible restraint of trade in violation of federal law.

3.  By tying the sale of Premium Cable Services to the rental of cable boxes, Mediacom has significantly restricted competition in the market for the sale or rental of cable boxes, enabling Mediacom to reap substantial competitive profits from Class Members. Mediacom will not permit a customer to acquire ownership of a cable box from Mediacom and Mediacom claims that third party cable boxes are incompatible with Mediacom's cable processing system. Mediacom has used this restraint of trade to extract additional revenues from Premium Cable customers by charging monthly rental fees in addition to the fees it charges for the Premium Cable Services.

4.  Plaintiff brings this case as a representative of a class of Mediacom Premium Cable customers described herein, alleging that Defendant's past and present activities constitute

an impermissible restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act"), and these activities have and will continue to threaten to have adverse competitive effects on interstate commerce and inflict direct economic injury upon the Plaintiff.

## THE PARTIES

5.    Plaintiff Jim Knight is, and at all relevant times was, a citizen of the State of Missouri, residing in Springfield, Missouri.  Mr. Knight is, and at all relevant times has been, a subscriber of Premium Cable Services, as defined herein, provided by Mediacom.

6.    Defendant Mediacom is a publicly held New York corporation with its principle place of business located at 100 Crystal Run Road in Middletown, New York.

7.    Upon information and belief, and for the purposes of this complaint, Mediacom develops cable systems to provide entertainment, information, and telecommunications services in the United States.  It offers a selection of products and services, including video services, such as broadcast basic services, family basic services, digital services, pay-per-view services, video-on-demand services, high-definition television services, and digital video recorders.

8.    Mediacom's unlawful business practices, as detailed herein, are uniform within the markets in which Mediacom sells its services.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, in that Plaintiff, on his own behalf and on behalf of the Class, asserts claims under the Sherman Act, 15 U.S.C. § 1.

10.    Venue is proper in this Court under 15 U.S.C. § 22 because Mediacom is a New York Corporation, its principle place of business is within this district and it transacts business here.

## FACTUAL ALLEGATIONS

11.     Mediacom is the eighth largest provider of cable multi-channel video programming distribution ("MVPD") in the United States. It currently provides services in 23 states including: Alabama, Arizona, California, Delaware, Florida, Georgia, Iowa, Illinois, Indiana, Kansas, Kentucky, Maryland, Minnesota, Missouri, Mississippi, North Carolina, Ohio, South Dakota, and Wisconsin. As of December 31, 2008, 2.85 million homes subscribed to Mediacom's cable systems and Mediacom served 1.32 million basic cable subscribers. The company provides digital services (including Premium Cable Services) to 643,000 customers.

12.     Like other major cable MVPD providers, Mediacom faces minimal, if any, competition in the geographic areas in which it operates. Historically, multi-channel video programming transmitted in formats other than cable (e.g., satellite) have not been viable substitutes for cable MVPD because they do not offer important local programming or require the purchase of additional equipment. Moreover, cable MVPD providers tend to operate in distinct geographic areas and not to compete against each other. Accordingly, as set forth in greater detail below, Mediacom has substantial economic power in the areas in which it operates.

13.     Mediacom abuses its economic power by requiring consumers who purchase Premium Cable Services to use and to rent a separate product, a cable box, that it distributes. Mediacom's past and present conduct described herein allows it to unfairly utilize its market power and economic power in the cable television markets controlled by Mediacom to compel the Class to acquire necessary cable boxes solely through rental from Mediacom, thereby harming members of the Class by removing competition for the retail sale of cable boxes.

**The Tied and Tying Product**

14.     Mediacom's cable programming is offered to customers based upon tiers of service. At the basic level of service (referred to as "Family Basic Service"), the cable may be connected directly to modern television sets without the need for additional equipment. With the Family Basic Service, customers receive a limited number of local and national channels for a monthly fee.

15.     For an additional monthly fee, customers who wish to have more choice in video programming than Family Basic Service, can subscribe to Mediacom's Premium Cable Services (part of the digital service package) and pay an increased monthly fee to Mediacom. Premium Cable Service is a higher-tiered product than the Family Basic Service. It offers superior quality, a significantly broader range of programming options and a more personalized entertainment experience. Mediacom customers pay a substantial monthly fee for Premium Cable Services. Cable MVPD companies, including Mediacom, generate substantial revenue from those Premium Cable fees.

16.     For purposes of this Complaint, "Premium Cable Services" is defined as those cable services, which are not available to customers by simply plugging a cable into a cable ready television. This definition includes all scrambled or otherwise secured video channels; numerous specialty channels, such as news and sports channels; various channels that subscribers can pay to receive, such as Starz, Encore, HBO; "pay per view" which allows subscribers to purchase unique programs not otherwise available; and "on-demand" cable video programming which allows subscribers to watch certain programs at the time of their choosing and to pause, fast-forward and rewind those programs.

17. According to a recent Federal Communications Commission ("FCC") report on competition in the industry, as of 2005, there were approximately 96.9 million subscriptions for Premium Cable Services sold by cable MVPDs (including, but not limited to, Mediacom) in the United States.

18. The Premium Cable Service(s) offered by Mediacom is the "typing product."

19. In addition to paying a fee for cable television, customers must also pay a rental fee to Mediacom for a cable box, sometimes referred to as a "set-top box." The cable box essentially serves two functions: (1) it allows the customer to receive video signals and to navigate among the channels carried on a particular cable system and (2) it is a cable descrambler or "conditional access device" which controls the security features for premium channels to ensure that customers do not receive Premium Cable Services for which they have not paid.

20. The "tied product" is the cable box Mediacom rents to customers, for an additional monthly fee, to enable them to access Mediacom's Premium Cable Services.

21. For purposes of this pleading, the term "cable box" also includes the remote-control programmed for the cable box, whether or not Mediacom charges for rental of the remote control. For purposes of this complaint, the term "cable box" also includes cable boxes which include features in addition to those required to perform the basic navigation and security functions, including, but not limited to, cable boxes which have additional functionality, such as a Direct Video Recorder ("DVR").

22. A cable box is the only product that enables consumers to receive cable MVPD signals on their televisions and also to communicate their particular programming choices back

to the cable MVPD system. Thus, to engage in that two-way communication and to access the full range of Premium Cable Services, consumers need a cable box.

23.      The tying product and the tied product are separate and distinct products. Mediacom does not design or manufacture the cable box. Consumer electronics companies, such as Motorola, Scientific Atlanta and Samsung, manufacture these cable boxes, but their availability to the general public is limited. Mediacom purchases the mass produced cable boxes from the manufacturer and compels Premium Cable Services customers to rent the cable boxes from Mediacom. By requiring consumers who purchase Premium Cable Services to use and also to rent the cable boxes that it distributes, Mediacom has foreclosed competition in the market for the sale or rental of cable boxes.

**Mediacom Coerces Premium Cable Consumers to Rent the Cable Boxes that it Distributes**

24.      Mediacom requires class members to rent a cable box directly from Mediacom and from no source besides Mediacom. Mediacom claims that cable boxes must be rented exclusively from their company in order to send programming downstream to the customer's home.

25.      Mediacom also forces Premium Cable customers to pay a rental fee for every additional cable box after the first cable box that they order. Customers with multiple televisions must obtain multiple cable boxes, and each separate television requires its own cable box to access the Premium Cable Services that the customers purchased.

26.      Most cable MVPD providers, including Mediacom, employ a unique method of encrypting or scrambling the data they transmit through their cable MVPD systems. Such measures prevent consumers from accessing services for which they do not pay.

27.    The capacity to un-encrypt or descramble data is distinct from the ability to receive and navigate data, and, as such, consumers need a specialized device to perform that security function. Absent those security measures, consumers would only need a cable box to *view* Premium Cable.

28.    Since the security function is distinct from the reception and navigation function, there is no legitimate justification for combining those two functions in one device. But Mediacom, along with other cable MVPD providers, continues to embed the device that performs the security function into the cable boxes that it distributes. Moreover, as discussed below, the only way for consumers to satisfy the security function while also gaining access to all Premium Cable Services is to use the cable boxes that Mediacom distributes. In other words, Premium Cable customers cannot use cable boxes from third-party manufacturers since these boxes are incompatible with Mediacom's security functions. This further and severely limits consumers' ability to freely select a cable box.

29.    Mediacom's practice of requiring consumers to rent a cable box from Mediacom to the exclusion of any other source was recognized as an anti-competitive practice. Congress enacted 47 U.S.C. § 549, Section 629 of the Communications Act of 1954, directing the FCC to adopt regulations prohibiting cable MVPD providers from using security as an excuse to make consumers rent the cable boxes that they distribute.

30.    The FCC's interpretation of Section 629 was intended to prevent a cable MVPD provider from integrating the security function into its cable boxes and then insisting that consumers use its cable boxes out of security concerns. This interpretation acknowledges that cable MVPD providers that successfully force consumers to rent the cable boxes that they distribute will also succeed in stifling competition in the cable box market. It also implicitly

acknowledges that cable MVPD providers have substantial economic power in the market for the provision of Premium Cable.

31.    Pursuant to 47 U.S.C. § 549, in 1998, the FCC, in an effort to stop the anticompetitive practices described herein, directed the cable industry to make the security elements of a cable box available separately from the channel navigation aspects of a cable box so that a free and open market for such cable boxes could be developed by consumer electronic retailers.

32.    Although Mediacom has continued to distribute integrated cable boxes that perform a security function, in an attempt to satisfy the separate security function compelled by the FCC, Mediacom offers an inadequate device known as a CableCARD.

33.    The CableCARD provides the same security/descrambling function as cable's cable boxes but can be plugged into "cable ready" digital devices (like digital TVs). However, as acknowledged by numerous sources, including the National Cable & Telecommunications Asssociation ("NCTA"), these CableCARDS are an inadequate and ineffective substitute for cable boxes:

> While CableCARDs were intended to spur the introduction of devices that could receive cable services without a set-top box, the FCC has adopted an unnecessary regulation – known as the "integration ban" – that requires all cable-supplied set-top boxes to be re-designed so a CableCARD can be inserted. This regulation will likely cost cable consumers more than $600 million dollars per year in higher prices while offering no tangible benefits.

(http://www.ncta.com/IssueBriefs/2711.aspx, last visited December 19, 2009).

34.    While CableCARDs perform the security function, and can be plugged into certain cable ready televisions and, in theory, into non-integrated cable boxes, consumers still need a cable box in order to receive all Premium Cable Services. Accordingly, CableCARDs are a thoroughly inadequate substitute for cable boxes.

35.     Furthermore, CableCARDs do not perform two-way communication. A Premium Cable Service subscriber who opts for CableCARDs would have to forego the on-demand, pay-per-view and interactive video guide services that are vital components of Premium Cable Services, since a cable box is necessary for these functions. Accordingly, Mediacom's website clearly states: "On Demand services are included in Mediacom digital programming services and require a digital converter [cable box]." (http://mediacomcable.com/cable_ppv.html, last visited December 19, 2009).

36.     Additionally, Mediacom's website states that certain entertainment programming included in Premium Cable Services packages, such as the Music Choice channels, are "not available to cable card users" and are only available to customers who rent a cable box. (http://mediacomcable.com/cable_music.html, last visited December 19, 2009).

37.     Manufacturers of consumer electronic products who would like to enter into the market for cable boxes, have repeatedly complained that Mediacom and other cable companies have engaged in practices to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes. For example, in December, 2006, the Consumer Electronics Association ("CEA") sent a lengthy objection to the FCC concerning the practices of cable MVPDs which were hindering the implementation of CableCARDs and preventing consumer electronics manufactures from competing in the cable box market. Thus, the existence of the CableCARD has not produced the intended result of introducing competition into the market for cable boxes.

38.     In essence, Mediacom has used it control over the geographic markets in which it does business to inhibit and prevent the effectiveness of CableCARD technology and to preserve its ability to coerce its customers into acquiring cable boxes solely by rental from Mediacom in a

non-competitive market. Mediacom and other MVPDs have limited the effectiveness and
functionality of CableCARDs, making it highly unlikely that even the relatively few customers
owning new televisions with CableCARD capabilities would choose to rent the CableCARDs
from Mediacom.

39.     These limitations severely limit the desirability of CableCARDs, so that
consumers will have no real option but to rent a cable box from Mediacom. Despite the FCC
mandated creation of CableCARD technology, Mediacom continues to limit the employment of
that technology and continues to require consumers of its Premium Cable Services to rent their
cable boxes from Mediacom as a requirement of receiving the Premium Cable Services for
which they pay. As a result of Mediacom and other MVPD's actions, CableCARD technology
has not been widely adopted or marketed by consumer electronic manufacturers.

## Mediacom Possesses Economic Power in the Tying Product Market

40.     According to Mediacom's 2008 10-K Annual Report, Mediacom is the nation's
eighth largest cable company.

41.     Generally, Plaintiff and all other current and potential Mediacom cable
television subscribers have no choice but to contract with Mediacom for cable service.
Accordingly, Mediacom has *de facto* monopoly power in many areas in which it provides
cable television services or otherwise has sufficient market power to substantially restrain free
competition as alleged herein. Indicative of such monopoly power, over the last decade,
average cable prices paid by consumers have risen by 93%, or three times the inflation rate
over the same period.

42.     In those markets controlled by Mediacom, Mediacom's control over all cable
television services naturally gives Mediacom control over Premium Cable Services. Although

the tiers of service are different, Premium Cable Services rely upon the same basic
infrastructure, with the addition of the cable box in the customer's home.

43.     According to the Thirteenth Annual Assessment of the Status of Competition in
the Market for the Delivery of Video Programming, issued by the FCC on January 19, 2009
(the"FCC Assessment"), although video programming is distributed by means other than cable,
most notably broadcast and satellite services, cable MVPD is the dominant force in the market,
and enjoys a nationwide market share of almost 70%. A Congressional research report in 2007
found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for
direct satellite transmission. Moreover, any nationwide statistic on cable vs. satellite MVPD
competition under-represents Mediacom's competitive position in the markets in which it
chooses to do business, in that satellite MVPD services are available in areas in which no cable
television service is available. Conversely, in urban areas, the physical requirements required
to receive satellite MVPD services (an external surface with a clear sight line to the sky on
which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants
and apartment owners by landlords and/or condominium or cooperative rules. The difficulty in
meeting the physical requirements for receiving satellite MVPD services further limits the
competitive pressure of satellite services upon cable services.

44.     Additionally, because consumers use different equipment to access cable MVPD
than to access satellite MVPD, significant switching costs limit the attractiveness of moving
from one system to the other. Those switching costs include the time involved in changing
services, during which consumers may lose all access to MVPD, and the cost of obtaining new
equipment.

45.     In addition to Mediacom's claimed superiority in service and reliability over satellite MVPD services, Mediacom enjoys a competitive advantage over such services by its ability to "bundle" its MVPD services with broadband internet access and phone service, provided over the same cable facilities. Because broadband internet access and phone service are not available through satellite MVPD technology, Mediacom enjoys a competitive advantage over satellite MVPDs in those areas in which Mediacom does business.

46.     Moreover, in those markets in which Mediacom does business, it has a further advantage in that switching from Mediacom cable to another MVPD provider, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change. Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree (less than 50%) of satisfaction with their service, there remains little movement between the two.

47.     As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services. It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite, despite monopoly pricing for existing customers of the cable MVPD. The FCC Assessment cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs. However, in the few locations where consumers have a choice between two cable services, the FCC reports that prices for cable service are 20% lower than in locations with only one cable MVPD.

48.     There are also very high barriers to entrance for any potential cable competitor in an established cable MVPD market. The FCC Assessment notes that, along with the high

capital cost of constructing a parallel cable system, there are obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example - tenants in apartment buildings) and obstacles created by exclusive programming rights to popular channels. As a result of these obstacles, there has been very little effort to construct cable systems to compete with existing cable systems and such systems are believed to serve less than 2% of the MVPD market.

49.     The only apparently viable threat to Mediacom's market power has been the very recent arrival of competing MVPD services through fiber optic phone facilities offered, for example, through AT&T. These services have not previously been commercially available to consumers on a widespread basis and are viewed as an arising threat, rather than a current competitive influence upon cable MVPDs. Again, as with satellite MVPDs, customers incur substantial switching costs in changing service.

50.     According to the FCC Assessment, the demand for, and price of, Premium Cable Services has consistently risen, resulting in higher revenues for Mediacom and other cable MVPDs offering premium services.

51.     In sum, there is no form of MVPD that is reasonably interchangeable with cable MVPD and that has any significant market share or that challenges the economic power of incumbent cable MVPD providers.

52.     Mediacom's economic power over the provision of cable MVPD also gives it economic power over Premium Cable and basic cable, the two products that are distributed over its cable MVPD network. Additional market data information, which is only available through discovery, will provide greater detail of Mediacom's economic power.

**Mediacom's Illegal Tie Affects a Not Insubstantial Amount of Commerce in the Market for Cable Boxes**

53.     Because Mediacom claims that the cable boxes manufactured by third parties are incompatible with Mediacom cable services, customers do not have the ability to use other brands of cable boxes. Furthermore, Mediacom refuses to sell its customers the cable boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a Mediacom system.

54.     Because Mediacom and other cable MVPDs refuse to permit customers to acquire cable boxes other than by rental through the cable company, consumers suffer, and the suppliers to Mediacom and other cable MVPDs benefit from the lack of competitors and competition in the market for cable boxes. At the same time, Mediacom benefits from the absence of a competitive consumer market for cable boxes because the absence of competition allows Mediacom to compel consumers to rent the cable box from Mediacom, thereby producing a monthly revenue stream from the Class to Mediacom arising directly from its anticompetitive conduct.

55.     The choice to use other cable boxes is not available to the Class as a result of Mediacom's practices. By compelling customers to rent cable boxes, and in restraining an open market for cable boxes, Mediacom coerces Plaintiffs and the Class to pay a significantly larger sum of money than would be required if the two distinct products (Premium Cable Services and cable box) were not tied by Mediacom.

56.     In many cases, the rental fees that the Class is forced to pay for the cable boxes supplied by Mediacom exceed the true cost of the cable box, even if the cost of the cable box was unadjusted for the effect of the anticompetitive practices on the price of cable boxes.

57. The only consumers in the market for cable boxes are the consumers who purchase Premium Cable Services. Many consumers pay significant fees to Mediacom, and other cable MVPD providers, for the rental of cable boxes. Well aware of those fees, consumer electronics manufacturers have sought to enter the market for cable boxes and have objected to the FCC that cable MVPD companies have restricted their ability to do so. Major consumer electronics companies such as Motorola, Scientific Atlanta and Samsung manufacture these cable boxes.

58. However, if not for Mediacom's and the other cable MVPD providers' illegal tying practices, consumers would obtain substantially more cable boxes on the open market than is presently the case.

**The Effect on Interstate Commerce is Not Insubstantial**

59. Hundreds of thousands of customers throughout the nation purchase Premium Cable from Mediacom. A substantial portion of Mediacom's subscribers have upgraded from basic cable to digital video services, referred to herein as Premium Cable Services, and therefore rent cable boxes from Mediacom. Mediacom also purchases cable boxes from consumer electronics manufacturers and rents them to millions of customers throughout the country. Although the exact amount of money Mediacom earns from that conduct can only be determined through discovery, in light of the considerable fees it charges, that figure cannot be insubstantial.

**CLASS ACTION ALLEGATIONS**

60. Pursuant to Fed. R. Civ. P. 23(b)(1), (2) and (3), Plaintiff bring this action on behalf of himself and all others similarly situated as members of the proposed Plaintiff Class ("Class"). The proposed Plaintiff Class is defined as follows:

All persons in the United States who subscribe or subscribed to Mediacom for Premium Cable and used an accompanying cable box distributed by Mediacom.

61.     Plaintiff seeks certification of the Class under Federal Rules of Civil Procedure Rule 23(a) and (b)(3).

62.     Numerosity: The members of the Class are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members; (b) the precise number of Class members and their identities are unknown to Plaintiff but are well known to Defendant and can easily be determined through discovery; (c) it would be impractical and a waste of judicial resources for each of the thousands of individual Class members to be individually represented in separate actions; and (d) the relatively small amount of damages suffered by some of the Class members does not make it economically feasible for those Class members to file individual actions to protect their rights.

63.     Commonality/Predominance: Common questions of law and fact predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a. Whether Mediacom is liable to Plaintiff and the Class for violations of federal antitrust laws;
>
> b. Whether Mediacom has established an unlawful tying arrangement for the rental of cable boxes, in violation of federal laws;
>
> c. Whether Mediacom's actions have caused damages to Plaintiff and the Class;
>
> d. Whether Mediacom should be enjoined from further violations of state and federal laws; and
>
> e. Whether Mediacom is liable to Plaintiff and the Class for treble damages as a result of its violation of federal antitrust laws.

64.     Typicality: Plaintiff's claims are typical of the claims of the Class

members. Plaintiff and all Class members have been injured by the same wrongful practices engaged in by Mediacom. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

65. Adequacy: Plaintiff will fully and adequately assert and protect the interests of the Class he seeks to represent. Plaintiff has retained counsel who are experienced in class actions and complex mass tort litigation. Neither Plaintiff nor his counsel has interests contrary to or conflicting with the interests of the Class.

66. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the Class members is economically unfeasible and impractical. While the aggregate amount of the damages suffered by the Class is in the millions of dollars, the individual damages suffered by each Class member as a result of the wrongful conduct by Mediacom are too small to warrant the expense of individual lawsuits. Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

67. Plaintiff does not anticipate any difficulties in the management of this litigation. The federal courts have substantial experience in managing antitrust class actions.

## COUNT I
### (Violation of Section 1 of the Sherman Act for Unlawful Tying)

68. Plaintiff hereby incorporate by reference all allegations contained in the preceding paragraphs.

69. The Sherman Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce. 15 U.S.C. § 1. Congress has granted a private right of action to individuals harmed by violations of this act. 15 U.S.C. § 15.

70.    Plaintiff, on his own behalf and on behalf of the Class, seeks to recover damages he suffered as a result of Mediacom's violation of the Sherman Antitrust Act.

71.    Mediacom improperly ties and bundles its Premium Cable Services with the required rental of a cable box. Specifically, Mediacom contracted with Plaintiff, and all Class members, to provide Premium Cable Services but only on the condition that Plaintiff, and all Class members, also a pay a monthly rental fee to Mediacom for a cable box necessary to view and use the premium services.

72.    As detailed above, Mediacom affects the tie by coercing consumers who purchase Premium Cable to use the cable boxes that it distributes. For each cable box that Class Members obtain from Mediacom after the first, they are also forced to pay rental fees.

73.    No member of the Class, including Plaintiff, can unbundle or untie the two products at issue, namely, the provision of Premium Cable and cable boxes.

74.    There is a market for cable boxes separate and apart from the Mediacom Premium Cable Services; the two products are separate and distinct products. In fact, an individual can find cable boxes for sale on the open market today, but due to incompatibility and functionality issues, customers cannot use a third-party cable box when subscribing to Mediacom's Premium Cable Services. Mediacom claims that cable boxes must be rented exclusively from their company in order to send programming downstream to the customer's home.

75.    At all times relevant hereto, Mediacom has maintained sufficient power in the cable market to force Plaintiff and the Class to accept the rental arrangement which they otherwise would not accept absent Mediacom's extraordinary economic and market power.

76.    Mediacom's conduct has a substantial impact on interstate commerce in the market for cable boxes.

77.     Mediacom's bundling and tying of premium cable services and the cable box is an unreasonable restraint of trade in violation of the Sherman Antitrust Act.

78.     Mediacom's conduct has been, and continues to be, the direct cause of damage to the Plaintiff and the Class.

79.     There is no lawful business justification for Mediacom's conduct.

### COUNT II
### (Unjust Enrichment)

80.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs.

81.     To the detriment of Plaintiff and the Class, Defendant benefited from and was unjustly enriched by Mediacom's receipt of monies as a result of Plaintiff's and the other Class members' payments for cable boxes.

82.     Mediacom voluntarily accepted and retained these benefits.

83.     Mediacom received these benefits to the detriment of Plaintiff and the Class.

84.     It would be inequitable, unconscionable, unfair, unlawful and unjust for Mediacom to retain these unlawfully derived benefits.

85.     As a result of Mediacom's unjust enrichment, Plaintiff and the Class are entitled to restitution and disgorgement in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, demand judgment in their favor and against Mediacom as follows:

a.  For an Order certifying the Class pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as the Class Representative, and appointing their counsel as counsel for the class;

b.  For an Order that Mediacom violated the Sherman Antitrust Act, 15 U.S.C. § 1;

c. For an Order that Mediacom unjustly enriched itself at the Class' expense;

d. For an Order enjoining Mediacom from continuing the practice of tying premium cable services to the rental of a cable box from Mediacom;

e. For an award of all statutory damages under the Sherman Antitrust Act;

f. For an award of all compensatory and other damages suffered by Plaintiffs and the Class;

g. For an award of all costs incurred by Plaintiffs in pursuing this action;

h. For an award of reasonable attorneys' fees; and

i. For any other relief the Court deems reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all other similarly situated, hereby requests that this

action be tried before a jury.

Dated: February 22, 2010

POGUST, BRASLOW & MILLROOD, LLC

By: _____

Harris L. Pogust, Esq. (SDNY ID #HP8108)
Derek Braslow, Esq.
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428
Tel: (610) 941-4204
Fax: (610) 941-4245

Shawn Khorrami, Esq. (CA ID # 180411)
KHORRAMI POLLARD & ABIR LLP
444 South Flower Street, 33rd Floor
Los Angeles, CA 90071
Tel: (213) 596-6000
Fax: (213) 596-6010

Attorneys for Plaintiff